THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* WILLIAM DÍAZ JÜST, Defendant and Appellant.

No. CR-67-278. Decided March 14, 1969.

*Godofredo M. Gaetán* for appellant. *Rafael A. Rivera Cruz,
Solicitor General,* and *Lydia M. Franquiz, Assistant Solicitor
General,* for The People.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

Appellant was accused and convicted of violation of
§ 5-801, subd. (a) of Act No. 141 of July 20, 1960 (9 L.P.R.A.
§ 1041). On July 4, 1964, at about nine o'clock in the night-
time, he struck with his automobile, the rear part of a vehicle
driven by police officer Gerardo Batista. Immediately the po-
lice officer went toward defendant's vehicle. He found him re-
clined over the steering wheel of the vehicle he was driving.
He asked him repeatedly whether something had happened
to him and he did not answer. He asked the defendant to
alight from the vehicle. He alighted from the vehicle. The
officer states that the defendant smelled strongly of liquor.
He asked the defendant to walk, and as he was doing it with
difficulty and staggering, he decided to call another policeman
so that he would investigate. He asked the defendant to show
him his driver's license and he did so. The evidence did not
establish that he had any difficulty in finding the license. The
police officer testified, on cross-examination, that the defend-
ant behaved as a gentleman at all times. The other policeman
testified that when he arrived at the scene of the accident he
noticed that the defendant smelled strongly of liquor and
that he staggered. He also testified that he spoke incoherently.
He asked the defendant to submit to a blood or urine test. He
agreed. This witness stated, on cross-examination, that the
defendant acted respectfully at all times. He said that to

speak incoherently meant to him that what the person said could not be well understood. The physician who took the blood sample testified that the sample taken from the defendant was the first one he took in that dispensary. He stated that the nurse used alcohol as a disinfectant and that when he took the sample the arm was still wet. On cross-examination he said that defendant's behavior was normal "he answered every question I asked him, he cooperated, his composure was correct." When asked if he gave any impression of being in a state of intoxication, he answered, "clinically he did not give me that impression, the way in which he behaved was not that of a person in a state of intoxication . . . ." According to the expert chemist, Gloria Circums, the result of the analysis of alcohol in the blood was .23 hundredths of one percent by weight of alcohol in the blood.

Appellant assigns two errors: (1) admitting in evidence the chemical analysis of the blood, and (2) finding defendant guilty on the basis of a contradictory and insufficient evidence.

He maintains that the result of the analysis of the blood was vitiated and affected by the use of alcohol as an antiseptic in the arm from where the sample was taken.

█ It has been held that a blood sample taken under these circumstances discredits and diminishes the value of the analysis, making it inadmissible in evidence. *People* v. *Malone*, 197 N.E.2d 189 (N.Y. 1964); *People* v. *Ward*, 178 N.Y.S.2d 708 (N.Y. 1958); *People* v. *Douglas*, 183 N.Y.S.2d 945 (1959); *People* v. *Maxwell*, 188 N.Y.S.2d 692 (1959); *City of Columbus* v. *Marks*, 194 N.E.2d 791 (Ohio 1963); Richardson, Modern Scientific Evidence, § 13.11 (1961); Erwin, Defense of Drunk Driving Cases, § 14.06 (1963); Levin, *Blood Alcohol Tests and Drunken Drivers*, 1964, Insurance L.J. 453, 456 (1964); Rabinowitch, *Medicolegal Aspects of Chemical Tests of Alcoholic Intoxication*, 39 J. Crim. &

Crim. Law 225, 229 (1948). It is possible that the sample may be adulterated and that the alcohol used as an antiseptic may affect the result of the analysis. In the instant case the evidence established that when the sample was taken the arm was still wet with alcohol. This affected the scientific basis of the analysis and necessarily a reasonable doubt arises as to its value as a test for intoxication. Especially when the law provides that a certain result establishes a presumption to the effect that the driver is under the influence of intoxicating liquor, 9 L.P.R.A. § 1041. The Regulations approved by the Secretary of Health did not provide anything for this problem. It only established that "it shall be collected by venipuncture with a dry and sterile syringe and needle. . . ." 9 R.&R.P.R. § 1043–1(a). When taking the blood samples, special care should be exercised in doing it according to the norms and practices generally accepted, in order not to affect the reliability of the analysis. The Legislature was greatly preoccupied as to the taking of blood samples. It was specifically provided in subd. (g) of § 5-803 of the Vehicle and Traffic Law, that "only a physician, registered nurse, or minor surgeon . . . may take blood smears for determining its alcoholic content."

In an article entitled *Chemical Test for Intoxication Prosecution Viewpoint,*" which appears published in I Trauma 3-19-28 (1959 ed.), the procedure for obtaining a blood sample for the purpose of determining if a driver is under the influence of intoxicating liquor is explained. The author sets forth: "Alcohol should not be used to sterilize the skin at the time the sample is withdrawn since this might possibly give a false high reading. The National Safety Council recommends that tincture of iodine, tincture of methaphen, green soap, roccol, septisol or santomerse be used instead."

It should be pointed out that in the state of Virginia the law expressly provides that alcohol shall not be used as a dis-

infectant when taking a sample.[1] In an article entitled *Virginia's Implied Consent Statute: A Survey and Appraisal,* 49 Va. L. Rev. 386, 399 (1963), it is said:

"Little comment is needed to commend the legislature's foresight in prohibiting the use of alcohol as a sterilizer during the administration of a blood test. It has already been established that such procedure may invalidate test results."

See also, *Kyhl* v. *Commonwealth,* 135 S.E.2d 768 (Va. 1964).

For that reason it is necessary that the samples be taken observing every precaution to prevent that any doubt may arise as to the result of the analyses.[2] We know that traffic accidents represent a problem of acute dimensions and that a drunken driver is a serious threat. But above all this there is the responsibility of the trier in his function of dispensing justice according to the law. If a well-founded doubt arises as to the reliability of the analysis, the trier is bound to reject it.[3]

 Sometimes the doubt which may arise as to the credibility or reliability of the analysis is overcome, when the objective evidence shows that the driver was under the influence of intoxicating liquor. We have already decided that it can be established that a driver was under the influ-

---

[1] Virginia's statute provides thus:

"Only a physician, registered professional nurse or graduate laboratory technician, using some type of a cleanser or sterilizer for the instruments used and for the part of the body from which the blood is taken, other than alcohol or other substance which might in any way affect the accuracy of the test, shall withdraw blood for the purpose of determining the alcoholic content therein." 49 Va. L. Rev. 398–399.

[2] The convenience of amending the Regulations to the effect of stating that when the sample is taken no antiseptic containing alcohol, which may affect the result of the analysis shall be used, should be considered.

[3] Some authorities hold that the result of the analysis is admissible, but what is affected is its probative force. *Crews* v. *Commonwealth,* 138 S.E.2d 265 (1964); *State* v. *Schwade,* 131 N.W.2d 421 (1964); *State* v. *Erdman,* 391 P.2d 518 (1964). We understand that the best practice is not to admit it, and the samples should be taken following the norms generally established to safeguard the correct result of the analysis which, as we have seen, include that alcohol should not be used as a disinfectant.

ence of alcohol through the testimony of the persons who observed his behavior. *People* v. *Cabrera,* 84 P.R.R. 94 (1961) (Per Curiam); *People* v. *Superior Court,* 84 P.R.R. 378 (1962); *People* v. *Cruz Rivera,* 88 P.R.R. 321 (1963). But that did not happen in the instant case. Here the evidence introduced by the State does not establish, beyond a reasonable doubt, that appellant was under the influence of alcohol. The policemen testified that he smelled of liquor; that he staggered, and that he talked incoherently. But at the same time they testified that when he was ordered to alight from the vehicle, he immediately did so, that he showed his driver's license when it was requested, without it having been established that he had any difficulty in finding it, and that he answered all the questions. There is no proof that his pupils were dilated nor his eyes reddish. On the other hand, the physician who took his sample declared that his behavior was normal, that he answered every question asked him, that he cooperated well, and that clinically, the defendant did not give him the impression that he was in a state of intoxication. The fact that he staggered[4] and that he talked incoherently is not incompatible with the testimony of the physician who took the blood sample. It can be explained taking into consideration that the police officers observed him immediately after the accident occurred. Observe that they did not establish that his eyes were reddish nor his pupils dilated. This, and the fact that he could coordinate in order to answer every question, and that he found his license immediately, agrees with the observations of the physician. Evidently, the trial judge was impressed by the result of the blood analysis.

Clearly this evidence, without the support of the result of the analysis, does not establish defendant's guilt beyond a reasonable doubt. The judgment will be reversed.

---

[4] Even though it is affirmed that to talk incoherently is not to understand well what is being said, on cross-examination, it was admitted that all the answers he gave to the police were understood.

Mr. Chief Justice Negrón Fernández and Mr. Justice Blanco Lugo did not participate herein. Mr. Justice Pérez Pimentel concurs in the result.